Julie Cavanaugh-Bill (Nevada Bar #11533)
CAVANAUGH-BILL LAW OFFICES, LLC
401 Railroad St., Ste. 307
Elko, Nevada 89801
(775) 753-4357
julie@cblawoffices.org

Roger Flynn (CO Bar # 21078)
Jeffrey C. Parsons (CO Bar # 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org
(*pro hac vice applications to be submitted*)

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

GREAT BASIN RESOURCE WATCH; PRAYER HORSE, Inc.; and TABOOSI DIKUDU NO'OBATU NUMMA COOPERATIVE,

Plaintiffs,

vs.

DOUGLAS BURGUM, Secretary of the Interior; U.S DEPARTMENT OF THE INTERIOR, and BUREAU OF LAND MANAGEMENT,

Defendants.

Case No:

**COMPLAINT FOR VACATUR, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs, Great Basin Resource Watch (GBRW), Prayer Horse Inc., and Taboosi Dikudu NO'Obatu Numma Cooperative (collectively Plaintiffs or GBRW) file this suit for vacatur, and for equitable, declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§701-706, the Federal Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et. seq.*, federal law, and their implementing regulations and policies.

2. Plaintiffs challenge the decisions of the United States Department of the Interior (DOI), and the U.S. Bureau of Land Management (BLM)(collectively BLM), to approve and effectuate the Direct Sale of Public Lands in Lyons County, NV, to Atlantic Richfield Company (ARC), via BLM's Decision Record (DR) approved by BLM Nevada State Director Jon K. Raby on April 24, 2026 (released on May 1, 2026)[1]; including the Notice of Realty Action, 91 Fed. Reg. 8504-8506 (Feb. 23, 2026), along with BLM's Final Environmental Assessment (FEA)(DOI-BLM-NV-C020-2025-0010-RMP-EA)(revised April 24, 2026 and reissued May 1, 2026), BLM's Finding of No Significant Impact (FONSI)(revised April 24, 2026 and reissued May 1, 2026), and its Amendment to the agency's Yerington Anaconda Resource Management Plan (RMP), which were issued in support of the land sale. *See* BLM Project webpage: https://eplanning.blm.gov/Documents/?id=69474be5-a7f2-f011-8406-001dd80ef717&spid=b41d198f-a8f2-f011-8407-001dd80c29f3# (viewed May 20, 206).

3. According to the DR, the land sale (also known as the Anaconda Land Sale) may be effectuated 30 days after the public received the DR (after June 2, 2026). DR at 4. According to the BLM's project website: "Decision Record was signed April 24, 2026. A revised version of the EA is posted with edits responding to protest comments. Implementation decisions except Planning level decisions can be appealed through June 2, 2026." https://eplanning.blm.gov/Project-Home/?id=69474be5-a7f2-f011-8406-001dd80ef717 (viewed

---

[1] Shortly after issuing the April 24, 2026 Decision Record, State Director Raby retired from the BLM.

May 20, 2026).

4. Some of the lands to be given to ARC are contaminated from previous mining operations. "ARC is identified as potentially responsible party and is already under an obligation" for site cleanup under federal toxic waste cleanup laws and regulations such as CERLCA (known as the "Superfund" law). 91 Fed. Reg. 8505.

5. BLM will sell, for free, over 2,062 acres of public land, including all of the mineral estate and values, to ARC. This is despite BLM's admission that the Fair Market Value (FMV) of the lands, is at a minimum, "$760,000 as appraised under the Uniform Standards of Professional Practice (USPAP) for the sale parcels." 91 Fed. Reg. 8504.

6. The privatization of the currently-federal lands would allow ARC to avoid federal public land laws and regulations which currently govern the site and its cleanup and future uses.

7. BLM's actions violate numerous provisions of FLPMA, including: (1) "that disposal of a particular parcel will serve the national interest." 43 U.S.C. §1701(a); (2) "Sale of public lands shall be made at a price not less than fair market value." 43 U.S.C. §1713(d)(including mandated compliance with federal appraisal standards); and (3) preclusions against selling federal minerals. 43 U.S.C. §§1719 (a) and (b).

8. BLM also failed to fully review the environmental and other ramifications of the sale under FLPMA and NEPA, failing to take the required "hard look" at the baseline conditions, and direct, indirect, and cumulative impacts of the sale, including the evidence showing that the future use of the site will be for mining, as well as the impacts from nearby proposed mining and groundwater dewatering, as well as reasonable alternatives to the sale that would protect the public interest.

9. The challenged sale and privatization of the currently-public lands will immediately and irreparably harm plaintiffs and their members who use and value these lands, and an injunction is needed to protect plaintiffs, their members, and the public interest.

10. For these and the related reasons addressed herein, Plaintiffs ask this Court to declare that the sale, DR, Final EA/FONSI, RMP Amendment, and related actions noted herein

violate federal law. Plaintiffs ask this court to set aside/vacate and remand these decisions, and enjoin the sale until Defendants have complied with all applicable laws and requirements.

## BACKGROUND ON THE ANACONDA MINE SITE AND LAND SALE

11. "The Bureau of Land Management (BLM) is amending the 2001 Carson City Consolidated Resource Management Plan (CRMP) and authorizing the realty action set forth in the Proposed Action described in Chapter 2 of the Environmental Assessment (DOI-BLM-NV-C020-0010-RMP-EA) to proceed. This action will convey 2,062.42 acres of contaminated federal land to the Atlantic Richfield Company (ARC)." DR at 1.

12. In its February 23, 2026, Notice of Realty Action, the agency stated: "The Bureau of Land Management (BLM), Sierra Front Field Office, proposes a non-competitive (direct) sale of 2,062.42 acres of public lands to Atlantic Richfield Company (ARC) at no less than fair market value (FMV). The direct sale includes the underlying mineral estate. The BLM administers these public lands, which are located within and adjacent to the Anaconda Copper Mine Site (ACMS). The BLM will conduct the sale under applicable provisions of the Federal Land Policy and Management Act of 1976, as amended (FLPMA) and BLM land sale regulations. The FMV is $760,000 as appraised under the Uniform Standards of Professional Appraisal Practice (USPAP) for the sale parcels." 91 Fed. Reg. 8504.

13. "The disposal lands are comprised of five parcels that are west of the City of Yerington and east of the community of Weed Heights, at the eastern foot of the Singatse Range. The lands that the BLM is considering for disposal to ARC, under applicable provisions of sections 203 and 209 of FLPMA and the BLM land sale regulations at 43 CFR part 2710, are within and around the ACMS in Mason Valley, Lyon County, Nevada." 91 Fed. Reg. 8505.

14. "The site is an abandoned open pit copper mine and processing facility, located in Lyon County's Mason Valley, in western Nevada. The majority of copper mining, milling, and processing at the ACMS occurred between 1953 and 1978, and secondary milling and processing of ores occurred between 1978 and 2000. Anaconda merged with an ARC subsidiary in 1977, which merged into Atlantic Richfield Company in 1981." 91 Fed. Reg. 8505.

15. "ARC is identified as a potentially responsible party and is already under an obligation (pursuant to the Interim Administrative Order on Consent between the Nevada Division of Environmental Protection (NDEP) and ARC, dated February 5, 2018 (NDEP, 2018)). A direct sale would allow ARC to perform the CERCLA remedial action selected in 2017 by NDEP, the BLM, and the Environmental Protection Agency, for the Anaconda Copper Mine Site." 91 Fed. Reg. 8505.

16. The sale, however, is not needed for "ARC to perform the CERCLA remedial action" under the Interim Administrative Order on Consent. *Id.* Those "remedial" requirements apply regardless of whether the lands are public or private. *See* Interim Administrative Order on Consent, Feb. 5, 2018: https://ndep.nv.gov/uploads/land-aml-docs/20180205_ACMS_NPL_DA_and_Attachments_Signed.pdf (viewed May 20, 2026).

17. The remedial actions under the Interim Administrative Order on Consent have been ongoing while the lands have remained public, under BLM jurisdiction.

18. The sale will remove public ownership and BLM's regulatory oversight and authority over the lands and all current and future activities on the lands.

19. "Authorizing the proposed action (Serial Number NVN-097801) requires amending the 2001 Carson City Field Office Consolidated Resource Management Plan (CRMP). Of the 2,062.42 acres identified in the proposed action for disposal, 2,002.42 acres were previously designated for disposal in the CRMP and record of decision signed May 9, 2001." 91 Fed. Reg. 8504-5.

20. "The Yerington Anaconda RMP Amendment/EA Decision Record, when signed, would amend the CRMP to designate the additional 60 acres as suitable for disposal by sale from Federal ownership under FLPMA section 203(a)(1), which states that a tract of public land may be sold if the Secretary of the Interior determines that: '(1) such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands.'" 91 Fed. Reg. 8505.

21. BLM's "Purpose and Need" for the Sale states:

> [T]he ACMS is subject to CERCLA remediation and long-term monitoring. ARC has requested the purchase of BLM administered lands within the ACMS. ARC made this request to facilitate the remediation of health and safety hazards located on the ACMS. If the land is made private, the timeline for the development and construction of the final remedy will be shortened. Robust land use restrictions can be placed on the parcels to protect the remedial action, if made private. Additionally, any restriction placed by the BLM could be modified under future RMP amendments. The BLM has a need to respond to the request by ARC to purchase the BLM administered lands within the ACMS.

Final EA at 3.

## JURISDICTION

22. This is a suit pursuant to the APA, FLPMA, NEPA, and federal regulations and requirements. Jurisdiction over this action is conferred by 28 U.S.C. §§1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief).

23. Venue is proper in the District of Nevada pursuant to 28 U.S.C. §§1391(b) and (e). The BLM state office is located in Reno, and the local office is in Carson City. BLM's state and local office produced the challenged actions/decisions and are responsible for compliance with applicable laws and regulations. The sale is located in Lyon County, Nevada. Plaintiffs are non-profit organizations located in Washoe and Lyon Counties.

24. Plaintiffs have no other adequate remedy at law.

## PARTIES

25. Plaintiff GREAT BASIN MINE WATCH (GBRW) is a non-profit organization based in Reno, Nevada that is concerned with protecting the Great Basin's land, air, water, wildlife and communities from the adverse impacts of hardrock mining. GBRW members include ranchers, sportsmen, conservationists, and Native Americans dedicated to protecting the communities, land, air, water and Native American resources of the Great Basin. Members of GBRW have used, enjoyed, and valued the lands to be sold, for many years. Members of GBRW hike, view and generally enjoy using the area of the currently-public lands for recreational, historical, and conservation purposes. Members of GBRW intend on continuing to use and value the lands at, and affected by, the sale during 2026 and in future years. These uses will be immediately, irreparably, and significantly harmed by the sale and loss of public ownership.

26. PRAYER HORSE, Inc. is a Native-led nonprofit dedicated to protecting Indigenous cultural traditions, sacred lands, and environmental health in Nevada's Great Basin. The organization serves Indigenous communities in the Great Basin through culturally grounded activities, including annual multi-day Prayer Horse Rides, ceremonies, educational events, and youth engagement. Blending activism with healing, Prayer Horse helps revitalize Native identities while defending the land for future generations. Including in this, Prayer Horse's mission is to educate and relay the current ongoing closure actions at the Anaconda Copper Mine Site, and regarding the challenged sale of public resources/lands.

27. TABOOSI DIKUDU NO'OBATU NUMMA COOPERATIVE (the Cooperative) is an indigenous-led 501(c)(3) non-profit organization based in Yerington, Nevada that works to educate and advocate for responsible practices that prioritize the health of groundwater and surface water for future generations to come at the Anaconda Copper Mine Site in Yerington (the focus of the BLM sale). The Cooperative has worked for years submitting comments to state and federal agencies in an effort to ensure proper cleanup, public involvement and environmental protection at the Yerington/Anaconda site.

28. Plaintiffs bring this action on their own behalf, and on behalf of their members.

29. Plaintiffs' members live near, and regularly visit, use and enjoy the federal public lands to be sold to ARC. Members intend to continue these uses for recreational, cultural, religious and conservation purposes during 2026 and beyond. These uses and interests will be adversely affected, and many outright eliminated, by the sale, including by the resulting elimination of public access and federal environmental and public land laws aimed at protecting the public interest, public comment opportunities, and these lands and resources.

30. Defendants' failure to comply with NEPA and FLPMA additionally harms Plaintiffs and their members by denying them the right to informed decision-making and full disclosure under NEPA and FLPMA, as well as the right to meaningfully participate in the decision-making process.

31. Plaintiffs, for years, on multiple occasions, submitted extensive comments, administrative protests, and evidence to BLM objecting to the sale as violating FLPMA. As one

consequence of the sale, the public information and commenting requirements of FLPMA and NEPA, relied upon for years in this case, would no longer apply – eliminating Plaintiffs' and their members' rights to participate and present comments, objections, and information to BLM.

32. Plaintiffs' and their members' injuries will be redressed by the relief sought. If the challenged decisions are enjoined and vacated, as requested, the sale will not occur and the lands will remain public, with all the access and public rights inherent in public land.

33. DOUGLAS BURGAM is the Secretary of the Interior, with the responsibility to administer and implement applicable federal laws, including FLPMA and NEPA, and is sued in his official capacity. The DEPARTMENT OF THE INTERIOR is a cabinet-level executive agency responsible for, among other things, managing federally-owned lands, wildlife, and public natural resources throughout the United States. DOI has the ultimate responsibility to administer and implement FLPMA, and to comply with all other applicable federal laws, including FLPMA and NEPA.

34. The BUREAU OF LAND MANAGEMENT is an agency of Defendant DOI. BLM and its officers are responsible for administering federally-owned public lands and natural resources, under all federal laws applicable thereto, including NEPA, FLPMA, and the laws noted herein. The Nevada offices of the BLM issued the challenged April 24, 2026 Decision and the other actions challenged in this case.

## LEGAL BACKGROUND

### The Administrative Procedure Act (APA)

35. The APA provides for judicial review of federal agency actions for persons adversely affected or aggrieved by the agency action. 5 U.S.C. §702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy are subject to judicial review. *Id.* §704.

36. The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* §706.

37. An agency action is arbitrary and capricious if the agency relied on factors which Congress did not intend for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**The Federal Land Policy and Management Act (FLPMA)**

38. FLPMA is the "organic act" of BLM and governs the agency's management of public lands and resources. In FLPMA, Congress declared that is the policy of the United States to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and that, "where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. §1701(a)(8).

39. FLPMA also requires that: "In managing the public lands the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation [UUD] of the lands." 43 U.S.C. §1732(b). "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and state law." *Center for Biological Diversity v. U.S. Department of the Interior*, 623 F.3d 633, 644 (9th Cir. 2010).

40. Regarding land sales, "Congress declares that it is the policy of the United States that . . . the public lands be retained in Federal ownership, unless . . . it is determined that disposal of a particular parcel will serve the national interest." 43 U.S.C. §1701(a). *See also* 43 CFR Part 2710 (BLM land/mineral sale regulations).

41. All sales are subject to strict appraisal and Fair Market Value (FMV) requirements: "Sales under this part shall not be made at less than fair market value. Such value is to be determined by an appraisal performed by a Federal or independent appraiser, as determined by the authorized officer, using the principles contained in the Uniform Appraisal Standards for Federal Land Acquisitions. The value of authorized improvements owned by anyone other than the United States upon lands being sold shall not be included in the determination of fair market value.

Technical review and approval for conformance with appraisal standards shall be conducted by the authorized officer." 43 C.F.R. §2710.0-6(f).

42. FLPMA allows such sales only under strict requirements:

> (a) Criteria for disposal; excepted lands
> A tract of the public lands (except land in units of the National Wilderness Preservation System, National Wild and Scenic Rivers Systems, and National System of Trails) may be sold under this Act where, as a result of land use planning required under section 202 of this Act, the Secretary determines that the sale of such tract meets the following disposal criteria:
> (1) such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands, and is not suitable for management by another Federal department or agency; or
> (2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or
> (3) disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved prudently or feasibly on land other than public land and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in Federal ownership.

FLPMA, 43 U.S.C. §1713 ("Sales of Public Land Tracts"). *See also* 43 C.F.R. §2710.0-3 ("Authority").

43. Regarding BLM's sale of the federal mineral values/estate, which BLM proposes to do here (for free to ARC), FLPMA placed strict presumptions against such conveyances. "All conveyances of title issued by the Secretary, … shall reserve to the United States all minerals in the lands, together with the right to prospect for, mine, and remove the minerals under applicable law and such regulations as the Secretary may prescribe, except that if the Secretary makes the findings specified in subsection (b) of this section, the minerals may then be conveyed together with the surface to the prospective surface owner as provided in subsection (b)." 43 U.S.C. §1719 (a).

44. The "findings specified in subsection (b)" require that:

> (b)(1) The Secretary, after consultation with the appropriate department or agency head, may convey mineral interests owned by the United States where the surface is or will be in non-Federal ownership, regardless of which Federal entity may have administered the surface, if he finds (1) that there are no known mineral values in the land, or (2) the reservation of the mineral rights in the United States is interfering with or precluding

> appropriate non-mineral development of the land and that such development is a more beneficial use of the land than mineral development.
>
> (2) Conveyance of mineral interests pursuant to this section shall be made only to the existing or proposed record owner of the surface, upon payment of administrative costs and the fair market value of the interests being conveyed.
>
> (3) Before considering an application for conveyance of mineral interests pursuant to this section–
>
> > (i) the Secretary shall require the deposit by the applicant of a sum of money which he deems sufficient to cover administrative costs including, but not limited to, costs of conducting an exploratory program to determine the character of the mineral deposits in the land, evaluating the data obtained under the exploratory program to determine the fair market value of the mineral interests to be conveyed, and preparing and issuing the documents of conveyance: Provided, That, if the administrative costs exceed the deposit, the applicant shall pay the outstanding amount; and, if the deposit exceeds the administrative costs, the applicant shall be given a credit for or refund of the excess; or
> >
> > (ii) the applicant, with the consent of the Secretary, shall have conducted, and submitted to the Secretary the results of, such an exploratory program, in accordance with standards promulgated by the Secretary.
>
> (4) Moneys paid to the Secretary for administrative costs pursuant to this subsection shall be paid to the agency which rendered the service and deposited to the appropriation then current.

43 U.S.C. §1719(b).

45. "FLPMA includes statutory provisions requiring public participation. FLPMA provides that '[t]he Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans.' 43 U.S.C. §1712(a) (emphasis added); 43 U.S.C. §1712(f). 'Public involvement' is defined to include 'the opportunity for participation by affected citizens in ... decisionmaking ... with respect to the public lands.' 43 U.S.C. §1702(d)." *Montana Wildlife Federation v. Haaland*, 127 F.4th 1 (9th. Cir. 2025).

**The National Environmental Policy Act (NEPA)**

46. The purposes of NEPA are: "To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. §4321.

47. "In NEPA, Congress recognized the 'profound impact' of human activities, including 'resource exploration,' on the environment and declared a national policy 'to create and maintain conditions under which man and nature can exist in productive harmony.' 42 U.S.C. §4331(a)." *Center for Biological Diversity v. U.S. Dept. of the Interior*, 623 F.3d 633, 642 (9th Cir. 2010). "Section 101 of NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 109 S.Ct. 1835, 1844 (1989).

48. NEPA has "twin aims." First, it requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002), quoting *Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

49. NEPA mandates "all agencies of the Federal Government" to perform certain procedures. 42 U.S.C. §4332(2), including for "major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

> reasonably foreseeable environmental effects of the proposed agency action;
> any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
> a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
> the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
> any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. §4332(2)(C). The "detailed statement" is known as an "Environmental Impact Statement" or "EIS."

50. BLM must: "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," 42 U.S.C. §4332(2)(D). It must make use of reliable data and resources in carrying out this Act, §4332(2)(E); and "study, develop, and describe technically and economically feasible alternatives." §4332(2)(F). "An agency shall

issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." §4336(b)(1).

51. "An agency shall prepare an environmental assessment [EA] with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown." §4336(b)(2). "If substantial questions are raised regarding whether the proposed action may have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

**ADDITIONAL FACTUAL BACKGROUND**

**Reasonably Foreseeable Actions and Future Markets for the Lands**

52. In the Final EA, BLM never analyzed the environmental impacts of future mining/remining of the lands to be sold. Nor does the FEA analyze the proposed mining of the adjacent lands owned by Lion Copper and Gold (LCG). The FEA ignores the fact that even if ARC has not stated whether it has remining plans, other companies do that are in negotiations with ARC to acquire the lands. Namely, LCG who now wholly owns Singatse Peak Services LLC (SPS).

53. Documents cited/referenced in the following footnotes or text were previously submitted into the administrative record by Plaintiff GBRW to BLM as part of GBRW's comments on the proposed sale.

54. LCG recently stated: "In order to facilitate remediation by ARC, advanced discussions are ongoing between ARC and BLM for ARC to acquire the BLM unpatented mining claims at the Yerington Property. *Upon acquisition, ARC will convey title to all minerals to SPS and the parties will execute a Surface Use Agreement allowing SPS the right to explore and mine the property* [emphasis added]."[2] (p. 6-3)(emphasis added).

[2] "Preliminary Economic Assessment of the Yerington Copper Project," for Lion Copper and Gold. March 12, 2024. https://www.lioncg.com/pdf/2024_leo_yerington_pea_tr.pdf

55. SPS/LCG has been public about its interest and plans for remining portions of the Anaconda site, and LCG has been actively developing remaining plans that are outlined in a Preliminary Economic Assessment from 2024. Yet the FEA ignores the evidence that mining/remining and related operations are "reasonably foreseeable."

56. In addition, SPS has filed applications[3], with the Nevada Division of Water Resources (NDWR) in 2024 for the expressed purpose of dewatering (draining) the Anaconda mine pit and lake (portions of which are included in the proposed BLM sale) as noted in the applications, "Water under this application will be used in support of Yerington Mine development and mining and mining operations. Dewatering the Yerington Pit Lake is required to continue mining processes," and in a pre-hearing meeting between SPS and water application protestants.[4] Again in 2026 SPS filed another set of applications[5] that states the reason for this set of permits as, "Singatse Peak Services (SPS) seeks to appropriate diversion rate to support pit take emptying and dewatering phases of mine development." These applications provide further evidence of plans to remine the Anaconda site, likely imminent within a few years and certainly "reasonable foreseeable."

57. According to testimony before the Subcommittee on Federal Lands hearing on H.R. 5347, The Lyon County Economic and Environmental Remediation Act on July 17, 2018: "The Atlantic Richfield Company does not intend to hold this land long term but will transfer ownership to an unaffiliated entity that purchased most of the former mine site in the early 2000s and is currently investigating additional mining opportunities."[6] The entity is Singatse Peak Services LLC (SPS), a subsidiary of Quaterra Resources INC, who acquired private land, patented claims,

---

[3]Nevada Division of Water Resources, Applications 93718 through 93725.

[4]Nevada Division of Water Resources, Status Conference for processed applications 93718 through 93725 for Singatse Peak Services, LLC.

[5]Nevada Division of Water Resources, Applications 94985 through 94995.

[6] U.S. House of Representatives, "LYON COUNTY ECONOMIC DEVELOPMENT AND ENVIRONMENTAL REMEDIATION ACT," 115 Congress 2nd Session, Report 115-1002.

and 32 unpatented mining claims on April 27, 2011 when SPS closed a transaction under which all property and water rights of Arimetco, Inc. (Arimetco) were transferred.[7]

58. Members of the Nevada congressional had submitted a bill that would have accomplished the sale. Representative Amodei's Bill, H. R. 5347 (not passed), acknowledged that the goal of the sale is to facilitate "future mining" on the lands:[8]

> "the conveyance of the Federal selected lands will promote economic development within the County by consolidating private land for future mining activities."

59. Yet the DR, FEA, Federal Register Notice, and sale approval fail to mention the "future mining activities" or future "economic development" that is the true basis and reason for the land sale.

60. More recently, LCG has publicly reinforced its future mining and other operations slated for the sale lands. In LCG's 2024 "Preliminary Economic Assessment of the Yerington Copper Project Lion Copper and Gold Corp., Yerington, Nevada, Effective Date: January 30, 2024, Report Date: March 12, 2024" the company stated that:

> From the inception of its efforts at Yerington, SPS believed that the best way to clean up the former Yerington Mine was to start a new mine. One of the benefits of restarting mining at Yerington is that it was formerly an active mine site located on approximately 3,500 ac. of previously disturbed land. By utilizing the central brownfield real estate at the Yerington Property for new mine infrastructure, the disturbance of new land is significantly reduced. A study funded by EPA regarding the Yerington Property concluded "Given these [BLM and Quaterra] primary landowner interests, mining is the most likely anticipated future land use for the Site" (E2, April 2010).

LCG 2024 Report at p. 24-4. https://minedocs.com/26/Yerington-PEA-01302024.pdf (viewed May 15, 2026).

---

[7] Singatse Peak Services, LLC, "NI 43-101 Technical Report Mineral Resource Update Yerington Copper Project Lyon County, Nevada." January 3, 2014 (previously submitted with GBRW scoping comments in January 2021).

[8] U.S. House of Representatives, "H. R. 5347 - To facilitate resolution of environmental remediation and reclamation, resolve potential liability of the United States, and promote economic development in Lyon County, Nevada, and for other purposes.," March 20, 2018.

61. LCG is currently advancing the Yerington Copper Project, which is adjacent to the sale lands.

> The Yerington Copper Project encompasses the historic Yerington and MacArthur open-pit mines, positioned in one of the most promising copper districts in the U.S. With a robust Pre-feasibility Study recently filed, the project is well-advanced and progressing toward development. Lion Copper & Gold (Lion CG) is advancing the site with a modernized mining approach-utilizing existing infrastructure, advanced bioleaching technology, and a mining-friendly regulatory environment to accelerate production timelines.

Yerington Copper Project - Lion Copper and Gold Corp. website, https://lioncg.com/projects/yerington-project/ (viewed 5-18-26). In addition, in 2025, LCG completed its Technical Report detailing the Project operations, with significant impacts to the area. NI-43-101-Yerington-Copper-Project-IFS-Final-Release-wSignatures.pdf (viewed 5-15-26).

62. LCG stated that the sale essentially represents the green light for its planned mining/remining. *See* LCG 2024 Report at 6-3 ("This PEA [2024 LCG Report quoted above] has been prepared assuming the land sale of BLM properties will be completed prior to the start of mining."[9]

63. Thus, the claim in the BLM FEA that there are no other Reasonable Foreseeable Future Actions (RFFA) that may occur on the parcels to be sold is unjustified and ignores clear evidence of plans to re-mine/mine in and around the Anaconda mine site/ACMS. There have been plans proposed by Quaterra Resources Inc. and Singatse Peak Services (SPS) that have been combined into the Yerington Copper Project now proposed by LCG, where SPS is wholly owned by LCG.

64. LCG states that its plan for mining/remining "has been prepared assuming the land sale of BLM properties will be completed prior to the start of mining."[10] 2024 Report at 6-3. Thus,

---

[9] "Preliminary Economic Assessment of the Yerington Copper Project," for Lion Copper and Gold. Effective Date: January 30, 2024, Report Date: March 12, 2024. https://www.lioncg.com/pdf/2024_leo_yerington_pea_tr.pdf

[10] "Preliminary Economic Assessment of the Yerington Copper Project," for Lion Copper and Gold. Effective Date: January 30, 2024, Report Date: March 12, 2024. https://www.lioncg.com/pdf/2024_leo_yerington_pea_tr.pdf

LCG is poised to begin to develop the mining/remining (including the Yerington Copper Project) and other operations as soon as the land sale is completed. BLM's FEA fails to anticipate, let alone analyze, mining/re-mining in the ACMS as a RFFA, whether within 10 years, or after (as the land sale permanently alters the land use and environmental review requirements under state and federal laws).

65. BLM failed to analyze the effects of remining/mining of the site, and all other reasonably foreseeable potential future uses of the site and nearby areas, including how remediation of the site would be different under a mining/remining scenario and under different federal/private ownership. It is in the public interest and a requirement of NEPA and FLPMA to evaluate all reasonably foreseeable future uses of the site, and impacts therefrom.

66. In addition, even if the FEA's refusal to consider these clearly "reasonably foreseeable" activities satisfies NEPA (which it does not), these proposals and statements show that the future market for the properties is for mining/remining, which the agency did not consider in its appraisal(s) and FMV analysis, in violation of FLPMA and its implementing regulations.

## CLAIMS FOR RELIEF

### COUNT ONE

*Violation of FLPMA*

**BLM Failed to Justify the Sale, and Elimination of Federal Public Lands Authority, As In the National/Public Interest**

67. Plaintiffs re-allege and incorporate the allegations in all preceding paragraphs by reference.

68. BLM's position that the sale is in the public and national interest, and that there is no public interest, or benefit, in retaining federal ownership (and continued application of federal laws such as NEPA and FLPMA) is unsupportable on the facts and controlling law.

69. In doing so, BLM failed to comply with FLPMA's mandate that "Congress declares that it is the policy of the United States that . . . the public lands be retained in Federal ownership, unless . . . it is determined that disposal of a particular parcel will serve the national interest." 43 U.S.C. §1701(a). "Sale of public lands shall be made at a price not less than fair market value." 43

U.S.C. §1713(d). "In no case shall lands be sold for less than fair market value." 43 C.F.R. §2710.0-6(c)(5).

70. BLM also failed to meet FLPMA's requirement that "disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved prudently or feasibly on land other than public land and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in Federal ownership." FLPMA, 43 U.S.C. §1713 (a)(3) ("Sales of Public Land Tracts").

71. BLM failed to provide a detailed analysis of the justification for it to remove itself from its oversight duties to protect public lands and ensure their continued use for the public good. BLM states that the sale is needed because: "Robust land use restrictions can be placed on the parcels to protect the remedial action, if made private." FEA at 3.

72. But BLM does not show that it cannot also require "robust land use restrictions" under federal law (when added to any state or local requirements that apply to private lands). Indeed, under FLPMA and federal law, as noted herein, BLM is required to impose these "robust land use restrictions" to protect public resources.

73. The DR repeats the legal fallacy "that the proposed direct sale does not reduce environmental protections or diminish regulatory authority." DR at 2. *See also* DR at 3 ("regulatory oversight, and environmental protections remain in place regardless of ownership."). This ignores the undisputed fact that the sale will completely eliminate BLM's "regulatory authority" and "regulatory oversight" under FLPMA and federal public land environmental laws.

74. In addition to erroneously believing that BLM's "regulatory authority" and "regulatory oversight" remains after the lands are privatized, BLM provides no convincing evidence that the public is better served with no federal oversight of lands that it has been entrusted to protect, and ignores BLM's substantial regulatory authority over the lands under FLPMA (such as the requirements to "prevent unnecessary or undue degradation" and protect public values). FLPMA requires that: "In managing the public lands the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation [UUD] of the

lands." 43 U.S.C. §1732(b). No such duty, or any other federal requirement, applies once the land is privatized.

75. "Section 206 of FLPMA forbids land exchanges unless the 'public interest will be well served.'" *Ctr. for Biological Diversity v. U.S. DOI*, 623 F.3d 633, 640 (9th Cir. 2010); 43 U.S.C. §1716(a). As noted, the same requirements apply to land sales as well as exchanges. That did not happen here.

76. In *Ctr. for Biological Diversity*, 623 F.3d 633, the Ninth Circuit rejected the agency's rationale, the same relied on by BLM here, that there was no essential difference between regulation of land whether it is private (state law only) or public (with additional federal requirements and jurisdiction). Thus, BLM's position that there is no public interest, or benefit, in retaining federal ownership is unsupportable.

77. The court faulted BLM for assuming – like the BLM does here – that future use of, impacts to, and regulation of, the land would be the same regardless of whether the sale occurred. 623 F.3d at 640. The court detailed the differences between regulation of mineral operations on public land under FLPMA and other laws and regulation under purely state law. 623 F.3d at 644-46. Although that case dealt with Arizona law, the same requirements apply to the differences between public land/mining law and Nevada state law.

78. The court found that BLM violated NEPA, and well as FLPMA's public interest requirement. 623 F.3d at 647. Similarly, the court found that BLM illegally amended the RMP, like it did here, based on its failure to review the proposed exchange and its impacts based on the different regulatory structure that would apply to public and private land. 623 F.3d at 647-48.

79. That is the case here, as the loss of federal ownership eliminates a suite of federal laws designed to manage the lands and protect environmental and cultural resources, such as NEPA, the National Historic Preservation Act (NHPA), and FLPMA.

80. FLPMA requires that a land sale meet specific criteria, which have not been met here. The FEA, at 2, states the following: "The conveyance of these lands would assist ARC in facilitating the remediation of health and safety hazards located on the ACMS." That is not a qualifying purpose under FLPMA. Nor does the FEA provide any evidence that the removal of

federal ownership will protect health and safety beyond what could be required if the lands were solely private. Perhaps the consolidation will make the process easier/cheaper for ARC, but it has not been shown that removing federal land oversight is in the public interest or has been adequately analyzed.

81. BLM has not shown that keeping the land public will prevent ARC from remediating the site, or complying with the current CERCLA agreements – which were made years before, and were not contingent upon the lands becoming private. BLM has not shown that removing federal land oversight is in the public interest or has been adequately analyzed.

82. Nor has BLM shown that the sale is needed "because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands." 91 Fed. Reg. 8505. The remediation has been ongoing on BLM-managed public lands, and BLM has offered no evidence that federal ownership of the lands has prevented ARC's compliance with the remediation orders, or that the public land status of the lands has made it "uneconomic to manage."

83. Regardless of the sale, the site is predicted to be fully cleaned-up within 3 years: "Currently NDEP has an aggressive schedule for the remediation of the ACMS. The Deferral Agreement and the Interim Administrative Order on Consent (IAOC) between the NDEP and Atlantic Richfield Company (ARC), dated February 5, 2018 (NDEP, 2018), calls for closure of the site by 2029." FEA at 1.

84. This cleanup/remediation is not contingent upon the sale. BLM cannot credibly assert that the cleanup/remediation can only occur if the lands are privatized.

85. Without providing any evidence, the FEA and sale are based on BLM's belief that the remediation process will proceed more quickly after privatization of the lands, which could be a benefit only if the scope and level of clean-up is not sacrificed in the process. BLM failed to demonstrate that the sale is in the best public interest and meets the FLPMA criteria.

86. BLM's actions violate FLPMA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. BLM's violation of law prejudices and adversely affects Plaintiffs' rights and interests.

COUNT TWO

*Violation of FLPMA*

**Failure to Ensure "Fair Market Value" Payment and Failure to Comply with Federal Appraisal Standards and Requirements**

87. Plaintiffs re-allege and incorporate the allegations in all preceding paragraphs by reference.

88. BLM's failure to properly ascertain, and ensure payment of, Fair Market Value for the lands to be sold violates FLPMA and its implementing regulations. BLM's appraisals, FMV determination, and related actions failed to comply with the federal appraisal standards as required by FLPMA.

89. Regarding the appraisals and the FMV determination, BLM failed to comply with the Uniform Appraisal Standards for Federal Land Acquisitions and the Uniform Standards of Professional Appraisal Practice (UASFLA), as required by FLPMA and 43 C.F.R. §2710.0-6 (f). "When appraising the federal land portion of the exchange, the regulations require that the appraiser 'estimate the value of the lands and interests as if in private ownership and available for sale in the open market.'" UASFLA at 53. https://www.justice.gov/d9/enrd/legacy/2015/04/13/uniform-appraisal-standards.pdf (viewed May 20, 2026).

90. The FMV appraisal must calculate and value the "Highest and Best Use." "The appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process. Therefore, appraisers must apply their skill with great care and provide market support for the highest and best use conclusion(s) developed in the appraisal. … market value must be determined with reference to the property's highest and best use, that is, to be needed in the reasonably near future." UASFLA at 22.

91. Notably, the "current condition" is not the determining factor for an appraisal. The Fed. Reg. Notice and appraisal(s) erroneously fail to account for the future market for minerals/mining at the site as noted above and commenters previous submittals on the record. *See Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180-84 (9th Cir. 2000)(ruling BLM

failed to comply with the federal appraisal standards, FLPMA, and agency regulations). Appraisals must be based on the future post-sale condition, where, as shown herein, mining/remining is being considered and will likely be the future use. "Uses that are 'reasonably probable' must be analyzed as a necessary part of the highest and best use determination." *Desert Citizens*, 231 F.3d at 1181 (quoting the Uniform Appraisal Standards).[11] "The appraisal report failed to consider the market demand for this potential future use, or any other reasonably probable uses for which the land may have been adapted." *Desert Citizens,* 231 F.3d at 1181-82.

92. The fact that mining-remining may not immediately occur does not allow BLM's appraisal to ignore these reasonably foreseeable uses and markets, especially when coupled with LCG's plans for the adjacent Yerington pit and associated lands (as well as the sale lands as noted above). "The fact that a parcel's highest and most profitable use 'can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value.'" UASFLA at 102, quoting *Olson v. United States*, 292 U.S. 246, 256 (1934). As long as there is a "reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future," those uses, and the market values must be part of the FMV calculation. UASFLA at 102.

93. As detailed above, and in BLM's Final EA, "Mineral exploration and development work are potentially amenable with the current land use and would not be hindered by the Proposed Action." Final EA at 25. Thus, BLM's failure to account for these potential future uses and market values violates the appraisal standards and FLPMA.

94. BLM erroneously ignored the reasonably future market uses and values of the lands – which the record shows is for mining or re-mining of the parcels.

95. BLM ignored evidence submitted by GBRW showing that another mining company, Lions Copper and Gold (LCG), which holds federal mining claims on the lands to be

[11] If BLM believes that the current market controls, the EA, FMV, and appraisals are erroneous, for as noted herein, the lands to be sold are covered by mining claims which must be considered, especially because these claims are not owned by ARC, but rather SPS/LNG.

sold, and adjacent private lands, intends on purchasing the lands from ARC after the sale – for the purposes of using the lands for mining operations.

96. The BLM's FEA, and apparently also the appraisals (as BLM refused to provide them in response to GBRW's FOIA request), fail to mention that the public lands BLM intends to sell are covered by mining claims filed by Signatse Peak Services ("SPS" wholly owned by LCG). LCG plans to mine/remine the subject lands, thus evidencing the mineral values in these public lands. According to the LCG in 2024, arrangements have been made to transfer the mineral claims that ARC will acquire from the land sale to SPS.

97. "In order to facilitate remediation by ARC, advanced discussions are ongoing between ARC and BLM for ARC to acquire the BLM unpatented mining claims at the Yerington Property. Upon acquisition, ARC will convey title to all minerals to SPS and the parties will execute a Surface Use Agreement allowing SPS the right to explore and mine the property. To complete the sale, BLM needs to prepare an Environmental Assessment (EA) and an appraisal of the property. The draft EA has been prepared and will be finalized when the appraisal is completed. The appraisal is underway by the Department of Interior's Appraisal and Valuation Services Office (AVSO). The appraisal will not value the minerals on the private/patented claims, which includes the open pit, the VLT and W-3 locations. SPS is coordinating with ARC regarding the timing and outcome of the BLM property transfer. This PEA has been prepared assuming the land sale of BLM properties will be completed prior to the start of mining."
"Preliminary Economic Assessment of the Yerington Copper Project," for Lion Copper and Gold. March 12, 2024, at 6-3. *See also, id.*, at Figure 4-2 (map of properties and claims, showing overlap with lands proposed to be sold), and Table 4-3 (list of unpatented claims on BLM lands).

98. The sale of public lands to private interests is of important interest to the public and must be a fully transparent process. BLM has failed to provide a detailed discussion of how land sale values were determined. BLM's response in the FEA Appendix B is: "The fair market value of the land was assessed by the Appraisal and Valuation Services Office (AVSO) of the Department of Interior. This valuation is not part of the Environmental Assessment and AVSO follows the Uniform Standards of Professional Appraisal Practice." *See also* 91 Fed. Reg. at 8504

(admitting that the FMV appraisal were not followed due to the AVSO "opining" on the market and values).

99. Instead, BLM based its review and appraisals on the view that the lands should be valued merely as "vacant" lands. 91 Fed. Reg. 8504.

100. BLM has also not shown that it has permission from LCG to sell the lands that contain its mining claims. Nor has BLM made the required determination of the mineral values and whether LCG's claims are valid under the mining laws, so as to properly value and appraise the lands to be sold. These failures violate, at a minimum, FLPMA, NEPA, and the appraisal requirements noted herein.

101. BLM's actions violate FLPMA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. BLM's violation of law prejudices and adversely affects Plaintiffs' rights and interests.

## COUNT THREE

*Violation of FLPMA*

**Illegal Sale of Federal Minerals**

102. Plaintiffs re-allege and incorporate the allegations in all preceding paragraphs by reference.

103. The sale includes the mineral estate, free of charge. 91 Fed. Reg. at 8504-05. But any such sale of federal minerals cannot occur, if at all, without complying with the detailed mandates in FLPMA Section 1719, which have not been met here. 43 U.S.C. §§ 1719 (a) and (b). "All conveyances of title issued by the Secretary, … shall reserve to the United States all minerals in the lands, together with the right to prospect for, mine, and remove the minerals under applicable law and such regulations as the Secretary may prescribe, except that if the Secretary makes the findings specified in subsection (b) of this section, the minerals may then be conveyed together with the surface to the prospective surface owner as provided in subsection (b)." 43 U.S.C. §1719 (a).

104. For example, there is no evidence that the agency has met the strict requirements

for mineral sale: "(1) that there are no known mineral values in the land, or (2) the reservation of the mineral rights in the United States is interfering with or precluding appropriate non-mineral development of the land and that such development is a more beneficial use of the land than mineral development." 43 U.S.C. §1719(a).

105. Nor has the agency shown that, even if those requirements were met, that the other prerequisites for sale of federal minerals have been met, including:

> (i) the Secretary shall require the deposit by the applicant of a sum of money which he deems sufficient to cover administrative costs including, but not limited to, costs of conducting an exploratory program to determine the character of the mineral deposits in the land, evaluating the data obtained under the exploratory program to determine the fair market value of the mineral interests to be conveyed, and preparing and issuing the documents of conveyance: Provided, That, if the administrative costs exceed the deposit, the applicant shall pay the outstanding amount; and, if the deposit exceeds the administrative costs, the applicant shall be given a credit for or refund of the excess; or
> (ii) the applicant, with the consent of the Secretary, shall have conducted, and submitted to the Secretary the results of, such an exploratory program, in accordance with standards promulgated by the Secretary.

43 U.S.C. §§1719 (b)(3).

106. BLM's actions violate FLPMA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. BLM's violation of law prejudices and adversely affects Plaintiffs' rights and interests.

COUNT FOUR

*Violation of NEPA and FLPMA*

**Failure to Take the Required "Hard Look" of the Impacts From, and Alternatives To, the Sale**

107. Plaintiffs re-allege and incorporate the allegations in all preceding paragraphs by reference.

108. BLM failed to fully review the environmental and other ramifications of the sale under FLPMA and NEPA, failing to take the required "hard look" at the baseline conditions, and direct, indirect, and cumulative impacts of the sale, as well as reasonable alternatives to the sale.

*a. Cumulative Impacts*

109. Under a leading Ninth Circuit's land exchange case, BLM must review the direct, indirect, and cumulative impacts from reasonably foreseeable activities on the currently federal lands (such as mineral development), and the court specifically required the agency to review the different impacts and aspects of future use of the lands under federal law (no sale/exchange) and under only state law (if the sale/exchange went forward). *Center for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 645-46 (9th Cir. 2010). The court required BLM, as part of its "meaningful comparison" of the different regulatory standards, to fully analyze "the environmental consequences of [the mining company's] likely mining operations."

110. The court faulted BLM for assuming – like the BLM here does – that future use of, and impacts to, the land would be the same regardless of whether the exchange occurred. 623 F.3d at 640. The court detailed the differences between regulation of mineral operations on public land under FLPMA and other laws and regulation under purely state law. 623 F.3d at 644-46. Although that case dealt with Arizona law, the same requirements apply to the differences between public land/mining law and Nevada state law. The court found that BLM violated NEPA, and well as FLPMA's public interest requirement. 623 F.3d at 647. Similarly, the court found that BLM illegally amended the RMP, based on its failure to review the proposed exchange and its impacts based on the different regulatory structure that would apply to public and private land. 623 F.3d at 647-48.

111. In its cumulative impact analysis, BLM failed to take a "hard look" at all actions:

> [A]nalysis of cumulative impacts must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment. . . . Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide.

*Te-Moak Tribe of Western Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (rejecting BLM EA for mineral exploration that had failed to include detailed analysis of impacts from nearby proposed mining operations).

112. The Ninth Circuit has repeatedly faulted the federal land agencies' failures to fully review the cumulative impacts of mining projects. In one case, vacating BLM's approval of a mine, the court stated that "'in a cumulative impact analysis, an agency must take a 'hard look' at *all* actions that may combine with the action under consideration to affect the environment.'" *Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016)(emphasis in original)(quoting *Te-Moak Tribe*). BLM violated NEPA because it "did not 'identify and discuss the impacts that will be caused by each successive project, including how the combination of those various impacts is expected to affect the environment.'" *Id.* at 1105, quoting *Great Basin Mine Watch*, 456 F.3d 973-74.

113. In *Great Basin Mine Watch*, the Ninth Circuit required "mine-specific . . . cumulative data," a "quantified assessment of their [other projects] combined environmental impacts," and "objective quantification of the impacts" from other existing and proposed mining operations in the region. *Id.* at 972-74. The agency cannot "merely list other [projects] in the area without detailing impacts from each one." *Id.* at 972. *See also ONRC v. Goodman*, 505 F.3d 884, 893 (9th Cir. 2007).

*b. Reasonable Alternatives*

114. Agencies must "study, develop and describe appropriate alternatives," including a no action alternative. 42 U.S.C. §4332(2)(C). To comply with NEPA, BLM's environmental document must "study, develop, and describe technically and economically feasible alternatives." 42 U.S.C. §4332(2)(F). Further, NEPA requires BLM to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §4332(H). BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990).

115. It is essential for the agency to consider all reasonable alternatives to the proposed action. One of the Ninth Circuit's leading EA/alternatives decisions holds: "Moreover, consideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process. … Thus the consideration of alternatives requirement is both

independent of, and broader than, the EIS requirement." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228-1229 (9th Cir. 1988)(citations omitted).

116. The FEA merely states that "The impact of the No Action Alternative is considered under each resource. The site remediation would still progress and all of the impacts of the remedial activities would be the same. The potential future activities on the lands would be the same, include the potential for future mining." (FEA, Appendix B). Again, the FEA ignores the consequences of documented foreseeable mining activities in and around the Anaconda site and how these are affected under the no action alternative as well as other possible alternatives, including keeping the lands under federal ownership.

117. Withholding of the mineral estate from sale is presumed under FLPMA, unless detailed requirements are met (which has not occurred here). This alternative was not considered, in violation of FLPMA and NEPA. This reasonable alternative (which would have the benefit of being in the public interest) was not even mentioned but in response to comments in the FEA. *See* Appendix B, BLM stating that: "If the lands and mineral estate remain in federal ownership after the remediation, then the BLM would have to consider future Plans of Operation for mining activities on those lands under existing mining laws." Thus, BLM is admitting that mining activities are certainly reasonable but that it is (erroneously) absolving itself from the responsibility of analyzing those mining plans in the public interest after the sale.

118. GBRW raised a number of other reasonable alternatives that BLM ignored in the Final EA. These included: removal from the sale of all lands through which the Walker River flows or removal of lands that might affect resources associated with the Walker River, such as riparian areas and recreation (e.g. portion of Parcel 5, removal from the sale of all lands around the current mining site (i.e., no buffer lands should be sold), allowing the sale only with stringent environmental controls to protect land, water, cultural, wildlife, recreation, and air resources as binding conditions of the sale, and allowing the sale only with significant restrictions limiting any future use to only remediation of the site.

119. This last alternative is particularly reasonable since BLM asserts that nothing but remediation will occur at the site (so as to avoid having to analyze other uses of the site such as

remining/mining). In other words, if BLM limits its review to only remediation, with no future remining/mining, then that should be a binding condition of the sale, binding on all future owners/users of the lands. Indeed, in order to comply with FLPMA's public interest requirement, at a minimum, the sale cannot occur without adopting these reasonable provisions/conditions.

120. BLM's actions violate NEPA and FLPMA and their implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. BLM's violation of law prejudices and adversely affects Plaintiffs' rights and interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that BLM's actions in reviewing and approving the land sale are arbitrary, capricious, and contrary to federal law;

B. Pursuant to the APA, vacate the DR, Final EA, FONSI, RMP Amendments, and agency decisions/actions approving the sale as noted above;

C. Enjoin any further implementation of the sale or privatization of the lands/minerals;

D. Vacate the sale and related transactions, and return the lands to federal ownership;

E. Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F. Grant Plaintiffs such further relief as may be just, proper, and equitable.

Dated May 21, 2026

Respectfully submitted,

*/s/ Julie Cavanaugh-Bill* (Nevada Bar #11533)
CAVANAUGH-BILL LAW OFFICES, LLC
401 Railroad St., Ste. 307
Elko, Nevada 89801
(775) 753-4357
julie@cblawoffices.org

*/s/ Roger Flynn* (Colo. Bar # 21078)
*Jeffrey C. Parsons* (Colo. Bar # 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2

Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
(*pro hac vice applications to be submitted*)

*Attorneys for Plaintiffs*