UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GREAT BASIN RESOURCE WATCH, *et al.*,

Plaintiffs,

v.

DOUGLAS BURGUM, *et al.*,

Defendants.

Case No. 3:26-cv-00378-MMD-CLB

ORDER

I.    SUMMARY

Plaintiffs[1] filed this suit to challenge the Bureau of Land Management of the U.S. Department of Interior's[2] decision to effectuate a sale of public lands located in Lyons County, Nevada to Atlantic Richfield Company ("ARC"). (ECF No. 1 ("Complaint").) Before the Court is Plaintiffs' Motion for Preliminary Injunction, seeking to enjoin this sale pending adjudication on the merits.[3] (ECF No. 11 ("Motion").)[4] The Court has considered the Motion and the related briefs, and the Court also held a hearing on July 13, 2026 ("the Hearing"). Plaintiffs have shown serious questions on the merits as to two of their claims—that the sale does not comply with land disposal requirements and BLM failed to take a "hard look" at the cumulative impacts of future mining activities—and that the balance of

---

[1]Plaintiffs are Great Basin Resource Watch, Prayer Horse, Inc., and Taboosi Dikudu NO'Obatu Numma Cooperative.

[2]Defendants are Douglas Burgum, the U.S. Bureau of Land Management ("BLM"), and the U.S. Department of Interior (collectively, "Federal Defendants"), along with Intervenor Defendant ARC. (ECF No. 25.) For the purposes of brevity, the Court refers to Federal Defendants and ARC collectively as "Defendants."

[3]BLM has agreed to stay the sale until July 27, 2026, unless the Court resolves the Motion earlier. (ECF No. 31 at 11.)

[4]Federal Defendants and Intervenor responded (ECF Nos. 31, 32) and Plaintiffs filed a combined reply (ECF No. 33 ("Reply")).

hardships tips sharply in their favor, in addition to demonstrating irreparable harm and that the requested relief serves the public interest. Accordingly, the Court will grant the Motion.

## II.    BACKGROUND

On April 24, 2026, BLM approved a direct sale of over 2,062 acres of public lands ("the Site") outside of Yerington, Nevada ("the Sale"), and the underlying mineral estate, to ARC, via BLM's Decision Record ("DR"), supported by the Notice of Realty Action ("NORA"), Final Environmental Assessment ("FEA"), Finding of No Significant Impact ("FONSI"), and Amendment to the Yerington Anaconda Resource Management Plan ("RMP") amending the 2001 Carson City Field Office Consolidated Resource Management Plan ("CRMP"). (ECF No. 11 at 6, 7-8.) ARC requested the Sale to "facilitat[e] the remediation of health and safety hazards located on the ACMS."[5] (11-2 at 9.)

BLM currently administers the Site, which is located within and adjacent to the Anaconda Copper Mine Site ("ACMS"), a former open pit copper mine. (ECF No. 1 at 4.) ARC is responsible for environmental cleanup at ACMS under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as a potentially responsible party. (ECF No. 11-2 at 10-11.) In 2002, the Nevada Division of Environmental Protection ("NDEP"), the U.S. Environmental Protection Agency ("EPA") and BLM entered into a Memorandum of Understanding relating to coordination and oversight of remediation activities. (ECF No. 11-2 at 11.) In 2005, BLM closed approximately two-thirds of the Site to the public due to environmental hazards. (ECF No. 30 at 7.) The following year, under the direction of the EPA, ARC erected fencing for site security that includes inside it federal lands used for mining and certain adjacent BLM

---

[5]In its response, ARC asserts that Defendants "have recognized that remediation may proceed without the Land Sale, [citation omitted] but have maintained that the Land Sale will allow clean up to proceed more efficiently." (ECF No. 30 at 21.) However, the records lack clarity as to what this means. At the Hearing, counsel for ARC suggested the efficiency stems from having one less party (i.e., BLM) involved in review of the remediation activities.

lands, and that fencing is still maintained. (*Id.* at 7-8.) NDEP has an aggressive schedule for remediation, which is slated to finish in 2029.[6] (ECF Nos. 11-2 at 9; 31 at 10.)

The Sale is for free, notwithstanding that the fair market value ("FMV") of the land was appraised at $760,000, because the BLM concluded that the Site has no current value due to cost of the remediation, both past and future forecast, and the contaminated land. 91 Fed. Reg. 8504 (Feb. 23, 2026) (ECF No. 31-2). Singatse Peak Services, LLC ("SPS"), owned by Lion Copper and Gold ("LCG"), currently owns the private lands and holds the unpatented mining claims on the public lands within ACMS. (ECF Nos. 11 at 13; 11-2 at 11.) The DR, Notice and FEA do not discuss possible future mining activities on the Site and lands adjacent to the Site, though Plaintiffs provided evidence to the BLM of LCG's interest and intent to mine/remine portions of ACMS and of LCG's Yerington Copper Project on adjacent lands during the public comment process. (ECF No. 11 at 13-15.)

Plaintiffs allege that BLM's decision to effectuate the Sale violated provisions of the Federal Land Policy Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701, *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et. seq.*, and seek relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. (ECF No. 1 at 2.) Plaintiffs bring the following claims: (1) failure to meet FLPMA's land sale requirements; (2) failure to ensure FMV and comply with federal appraisal standards in violation of the FLMPA; (3) illegal sale of federal minerals in violation of FLMPA; and (4) failure to take a "hard look" at the impacts of, and alternatives to, the Sale in violation of FLPMA and NEPA. (*Id.* at 17-29.)

## III.    DISCUSSION

Federal Rule of Civil Procedure 65 governs preliminary injunctions. "'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be

---

[6]Though Plaintiffs and Federal Defendants represent that the remediation is scheduled to finish in 2029, during the Hearing ARC's counsel noted that the remediation would be completed in 2030 (citing to ECF No. 30-4).

awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32 (2008)). To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest. *See Winter*, 555 U.S. at 20. A plaintiff may also satisfy the "sliding scale" variant of the *Winter* test by showing that there are "serious questions going to the merits"—a lesser showing than likelihood of success on the merits—if the balance of hardships tips sharply in plaintiff's favor and the other two *Winter* factors are satisfied. *See All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017); *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024).

Plaintiffs' underlying claims are governed by the APA. "Under the [APA], a reviewing court shall 'hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . ..'" *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)). "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). An "agency must examine the relevant data and articulate a satisfactory explanation for its action, including 'a rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Moreover, an agency's decision may be reversed as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. "To make this finding, the court must consider whether the decision

was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Plaintiffs argue that they have satisfied the *Winter* factors as to all their claims. In response, Defendants raise the threshold issue of Plaintiffs' lack of Article III standing as well as respond to Plaintiffs' arguments on the merits. The Court will first address the challenge to Plaintiffs' standing before turning to the merits of the Motion.

### A.    Standing

In gist, Defendants argue that two-thirds of the Site has been closed to public entry for over 20 years, and Plaintiffs have not demonstrated particularized use as to the accessible portions of the Site. (ECF Nos. 30 at 14-17; 31 at 15-17.) Plaintiffs counter that they have standing even if most of the lands are fenced off from public access. (ECF No. 33 at 10-13.) The Court agrees with Plaintiffs.

To establish standing, Plaintiffs must clearly demonstrate that (1) they have suffered, or will likely suffer, an injury in fact that is concrete, particularized, and actual or imminent—not abstract, generalized, or speculative; (2) the injury was likely caused, or will be caused, by the Sale; and (3) the injury will likely be redressed by their requested relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). "To demonstrate redressability, 'a federal plaintiff must show only that a favorable decision is likely to redress his injury, not that a favorable decision will inevitably redress his injury.'" *Arizona Mining Reform Coal. v. United States Forest Serv.*, 172 F.4th 641, 655 (9th Cir. 2026) (quoting *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000).

As an initial matter, ARC argues that Plaintiffs' claims should be dismissed as they relate to the fenced lands that Plaintiffs cannot access, because "Plaintiffs have not alleged with specificity that they use these lands." (ECF No. 30 at 13-14.) However, standing does not require Plaintiffs to show that they will be injured with respect to every portion of land involved in the Sale. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001) ("[W]e have never required a plaintiff to show that he has a right of access to the site on which the challenged activity is occurring . . .. If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact."); *see also Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1256 (E.D. Cal. 2006) (holding that plaintiffs had standing notwithstanding their lack of right to access the land).

The Court finds that Plaintiffs adequately demonstrate an injury in fact. Plaintiffs offered three declarations by their members, who state that they "have visited the [currently public lands to be sold] and adjacent public lands" as recently as April 26, 2026.[7] (ECF Nos. 11-12 at 3; 11-13 at 4; 11-14 at 3.) The declarants also state that they use public lands included in the Sale for recreational, cultural, religious, historical, conservation and other purposes; that they intend ongoing use; and that they would be irreparably harmed by the Sale. (*Id.*) Moreover one of Plaintiff's declarants, Joshua Dini, is a member of Plaintiff Prayer Horse, Inc. and a member of the Walker River Paiute Tribe. Dini states that he and his family historically used lands impacted by the Sale and continues to use them. (ECF No. 11-3.) Together, these three declarations provide more than conclusory assertions as to Plaintiffs' injury based on access to lands that have been opened and lands that are restricted.

Defendants argue that these statements are too generalized and vague to establish standing. (ECF Nos. 30 at 16 ("Only small fragments of [the Site] lie outside the fence. [citations omitted.] Plaintiffs have not alleged particularized use even of these

---

[7]Plaintiffs filed a supplement to John Hadder's declaration with their reply (ECF No. 33-1), which the Court does not and need not consider.

marginally accessible areas."); 31 at 15 ("[T]he declarations do not identify with specificity where the declarants allegedly visited, whether those locations are within the lands to be conveyed, or how the conveyance would affect their future use of any particular parcel.").) But Plaintiffs must show an injury in fact that is particularized, they need not offer particularized allegations as to where exactly their members have gone. *See, e.g., Friends of the Earth*, 528 U.S. at 181-83 (evaluating standing and describing adequate sworn statements from members, who would "hike, picnic, camp, swim, boat, and drive near or in the river" and "picnicked, walked, birdwatched, and waded in and along the [river]"). Federal Defendants also argue that the declarants offer noncommittal plans about future visits. (ECF No. 31 at 15-16.) Here, Plaintiffs' declarants sufficiently state that they will visit the lands and adjacent lands in coming months, which is more than a mere "some day" intention. *See Lujan*, 504 U.S. at 564 (finding no actual injury where an affiant confessed no plans to return).

Lastly, Federal Defendants argue that Plaintiffs have failed to establish causation and redressability because much of the public land at the Site has long been closed to public access. (ECF No. 31 at 17-18.) The Court agrees with Plaintiffs that this argument essentially rehashes their argument as to injury in fact. (ECF No. 33 at 13.) As the Court explained *supra*, Plaintiffs need not physically access the entire Site to demonstrate injury in fact. Plaintiffs have adequately showed both causation and redressability because they have demonstrated an injury in fact that would be redressed if the Sale is enjoined.

In sum, the Court finds that Plaintiffs have demonstrated that they have Article III standing to assert the claims in the Complaint.

**B.      Likelihood of Success on the Merits**

Plaintiffs argue that they have shown serious questions going to the merits on all claims. The Court agrees as to two of Plaintiffs' claims—the Sale violates FLPMA's land

sale requirements and the failure to take a "hard look" at cumulative impacts violates NEPA.[8] The Court will address these claims in turn.

### 1.    Violation of FLMPA for Failure to Justify the Conveyance

Plaintiffs contend that the BLM failed to meet FLPMA's land sale criteria.[9] (ECF No. 11 at 15-19.) Defendants respond that the BLM determined that the Sale met other FLPMA criteria by finding that management of the land was not cost effective or economic for BLM. (ECF Nos. 30 at 19-20; 31 at 19.) Plaintiffs counter that Federal Defendants rely on dated, vague and unsupported assertions to support this finding that will not survive the Court's arbitrary and capricious review. (ECF No. 33 at 15-16.) The Court agrees with Plaintiffs.

Through FLPMA, Congress "established a policy in favor of retaining public lands for multiple use management." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 877 (1990). "Congress declares that it is the policy of the United States that . . . the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest." 43 U.S.C. §1701(a). Under FLPMA, public land sales must meet one of three criteria:

> (1) such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands, and is not suitable for management by another Federal department or agency; or
> (2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or
> (3) disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved prudently or feasibly on land other than public land and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in Federal ownership.

---

[8]Accordingly, the Court need not address Plaintiffs' other claims to resolve the Motion.

[9]In their Motion, Plaintiffs focused their argument on BLM's failure to justify the sale under FLPMA's "national interest" requirement. (ECF No. 11 at 15-19.) Defendants dispute that FLPMA requires a land sale to be in the national interest. (ECF Nos. 30 at 19; 31 at 19.) The Court need not resolve this issue.

43 U.S.C. § 1713(a).

Federal Defendants contend that the parcels subject to sale satisfy the criteria established in section 1713(a)(1). (ECF No. 31 at 19.) As support, they point to BLM's 2001 CRMP, in which it designates for "potential future disposal approximately 185,000 acres" of BLM managed public lands, noting that "[i]n general these lands are those where BLM management is not cost effective." (ECF No. 31-14 at 62.) The lands are further categorized into lands that "are difficult and uneconomic to manage," "would support community expansion," have "possible agricultural potential" and are "identified for exchange to benefit Bureau programs." (*Id.*) As pertinent to the Site, "land west of Yerington" is included in list of other lands that "would support community expansion" including, "land surrounding the towns of Luning, Mina, Sodaville, Fallon, Gabbs, Reno, Verdi, and lands east of Montgomery Pass, near Honey Lake Valley, and Dixie Valley." (*Id.*) In 2026, the BLM amended the CRMP via the FEA to include the remaining 60 acres as "difficult and uneconomic to manage" because the 60 acres are within ACMS and the remediation area, and if not sold, "the BLM would be left with the responsibility of managing an isolated parcel within a designated NDEP remediation area." (ECF Nos. 11-2 at 10.)

Plaintiffs argue that agency decisions must be based on supportable evidence. Indeed, BLM "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43 (citation modified). Here, Federal Defendants have failed to do so. As Plaintiffs correctly point out, the CRMP merely made a preliminary determination as to 185,000 acres of BLM land, and that the "land west of Yerington" is mentioned once in a list of properties without explanation as to why it is not cost effective or difficult to manage. (ECF No. 33 at 15.) To the extent any economic cost to BLM is posed by ongoing remediation, Plaintiffs point out that such costs would be borne by NDEP, not BLM. (*Id.*; ECF No. 11-10.) Indeed, at the Hearing, counsel for Federal

Defendants confirmed that BLM has had no CERCLA obligation to perform remediation so far.

In response to the Court's inquiry at the Hearing as to how BLM benefits from the Sale or how the Sale is cost effective given that BLM has borne no costs for remediation, counsel directed the Court to possible future costs alluded to in the NORA as support for the sale under section 1713(a)(1). (ECF No. 31-2 at 2 ("ARC has also agreed to indemnify the BLM from past, present, and future use or occupancy of or operations on the sale parcels, subject to certain limitations, and to include a covenant not-to-sue the BLM in connection with the investigation and remediation of environmental conditions on or affecting the sale parcels.").) But this goes to BLM's decision to assess the Site at a FMV of $0, not BLM's decision to effectuate the Sale. This distinction is significant—the former relates to the fair market value of the disposed land, while the latter relates to BLM's duty under section 1713(a) to ensure land disposal meets certain criteria. Plaintiffs have shown that the record does not support that BLM considered these potential, speculative costs when determining that the Site was "difficult and uneconomic to manage" under section 1713(a)(1).

As to the 60 acres that were designated as eligible for disposal in 2026, counsel for Federal Defendants represented during the Hearing that the land would be difficult to manage due to administrative burdens involved in accessing the 60 acres within ACMS. But as Plaintiffs argue, the administrative records provide no evidence or sufficient explanation as to what makes the land difficult to manage, including these administrative burdens. The Court finds Plaintiffs' arguments persuasive.

Federal Defendants also argue that the Sale satisfies FLPMA because it will serve "important public objectives, including but not limited to, expansion of communities and economic development." (ECF No. 31 at 19-21); 43 U.S.C. §1713(a)(3). They point to BLM's 2026 FONSI, in which BLM stated it considered the beneficial impact of "timely remediation activities" and ARC's "request to facilitate the remediation of health and safety hazards." (ECF No. 31-19 at 4.) Federal Defendants additionally point to answers

given in response to comments in which BLM stated that "[a]dditional oversight of the federal lands portion of the site would add additional time to the ultimate remediation of the site" (ECF No. 30-18 at 58, 68.) But as Plaintiffs point out in reply, Defendants have not shown data or provided adequate explanation as to why, for example, BLM's ownership has or will hinder the clean-up. (ECF No. 33 at 16.) Indeed, Appendix B to the FEA provides that under No Action Alternative of no sale, "site remediation would still progress and all of the impacts of the remedial activities would be the same." (ECF No. 11-2 at 62.) Moreover, during the Hearing, counsel for Federal Defendants represented that the Sale would not make remediation faster but would result in cost savings and ease Federal Defendants' administrative burdens, and ARC represented that the BLM oversight is like having "another cook in the kitchen." But even if this was true, these benefits of administrative efficiency are not the purported basis for BLM's decision to effectuate the Sale as reflected in the relevant administrative records. In sum, the Court agrees with Plaintiffs that Defendants have not provided a satisfactory explanation as to the decision to effectuate the Sale.

Having reviewed the evidence on the record, the Court concludes that at a minimum, Plaintiffs have raised serious questions going to the merits as to whether BLM properly complied with FLPMA's criteria for land sales.

### 2.    Failure to Take a "Hard Look" in Violation of NEPA

Because the parties agree that the FEA did not consider possible mining plans on and adjacent to the Site, the issue is whether the plans were reasonably foreseeable. Plaintiffs argue that BLM failed to analyze the effects of future mining/remining of the Site and nearby areas, and the effects thereof under federal versus private ownership. (ECF No. 11 at 23-24.)  Defendants argue that BLM does not have enough information about "potential" or "nascent" mining plans for the future mining plans to be considered reasonably foreseeable. (ECF Nos. 30 at 26-27; 31 at 26-27.)

NEPA requires a federal agency to prepare a detailed environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The statement must address:

> (i) reasonably foreseeable environmental effects of the proposed agency action;
> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
> (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

*Id.* "An agency shall issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). "[W]hen determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 180 (2025). A court "should not micromanage [] agency decisions so long as they fall within a broad zone of reasonableness." *Id.* at 183.

The Court agrees with Plaintiffs that there are at least serious questions going to the merits as to whether BLM failed to take a hard look at the cumulative impacts of future mining activities. While Federal Defendants argue that they had inadequate information about future mining, and ARC underscores that neither LCG nor SPS have submitted a mining plan of operations to BLM, the Court finds that Plaintiffs have sufficiently rebutted both arguments. Plaintiffs point to ample information that they provided to BLM during the public comment process regarding future mining activity. (ECF Nos. 11-4 (Preliminary EA of the Yerington Copper Project noting "[u]pon acquisition, ARC will convey title to all minerals to SPS and the parties will execute a Surface Use Agreement allowing SPS the right to explore and mine the property."); 11-5 (SPS groundwater applications for mining

12

and mine operations affecting portions of the Sale); 11-6 (SPS applications to appropriate water for mining); 11-8 (2018 House Report noting that "[ARC] does not intend to hold this land long term but will transfer ownership to an unaffiliated entity that purchased most of the former mine site in the early 2000s and is currently investigating additional mining opportunities.").) Moreover, BLM need not have received mining plans for future mining to be reasonably foreseeable. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 646 (9th Cir. 2010) (holding that BLM violated NEPA by failing to take a "hard look" at the environmental impact of likely mining operations though no mining plans had been submitted).

Federal Defendants suggest that Plaintiffs' NEPA claim is infirm because after *Seven County* there is doubt as to whether BLM had an obligation to consider speculative future activity subject to separate agency approval. (ECF No. 31 at 24-25.) The Court finds instructive the Ninth Circuit's analysis in *Arizona Mining Reform Coalition*, 172 F.4th 641. In *Arizona Mining*, the Ninth Circuit Court of Appeals held that the Forest Service's failure to consider the mine's cumulative pumping impact on aquifer or existing wells alongside the groundwater impacts of a nearby residential development was not improper because the agency had no regulatory authority over that development. *Id.* at 659. The Court cited to *Seven County* in reasoning that the government had no obligation to consider "separate projects" over which it had no "regulatory authority." *Id.* (citing *Seven County*, 605 U.S. at 188). But here, and as confirmed by counsel for Federal Defendants during the hearing, BLM has authority over mining and has regulated mining activities in the area. Accordingly, future mining on the Site is not a separate project nor is the causal chain too attenuated.

While a Court's review of agency decisions is deferential, the Court finds that there are significant questions going to the merits as to whether BLM's failure to consider the cumulative impacts of future mining fall within a "broad zone of reasonableness." *See Seven County*, 605 U.S. at 190.

### 3.    Conclusion

In sum, the Court finds that Plaintiffs have met their burden of showing serious questions on the merits as to their FLPMA and NEPA claims, thus satisfying the first *Winter* prong.

### C.    Likelihood of Irreparable Harm

Proceeding to the second *Winter* factor, a plaintiff must prove a likelihood of irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. Irreparable harm is proven by demonstrating "immediate threatened injury." *See, e.g., Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) (citation omitted) (denying preliminary injunctive relief where "liability [was] too remote and speculative to constitute an irreparable harm").

Plaintiffs assert that they will be immediately and irreparably harmed if the Sale proceeds because Plaintiffs' members will lose access to the lands for religious, cultural, conservation and other recognized uses. (ECF No. 11 at 27.) In response, Defendants repeat the arguments they raised with respect to standing, namely, that Plaintiffs cannot show harm resulting from loss of access to the land, because Plaintiffs have been unable to access most of the land for years or do not clearly specify a precise location within the public lands. (ECF Nos. 30 at 28; 31 at 29.) The Court agrees with Plaintiffs.

Plaintiffs provide declarations from their members who state that their use of land would be immediately and irreparably lost if the Sale proceeds. The Court finds that this is an adequate showing of likelihood of irreparable harm that is neither remote nor speculative. Moreover, the Court rejects Defendants' arguments for the same reasons it has previously explained as to standing, *supra*. Additionally, while ARC contends that Plaintiffs' reliance on *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) is misplaced because that case considered plaintiffs' standing to challenge a FLPMA land exchange, the Court nonetheless finds Plaintiffs' argument persuasive: the privatization of public lands clearly poses irreparable harm to those who would access those lands.

The Court finds that Plaintiffs have met their burden as to the second *Winter* prong. Plaintiffs likely will suffer immediate and irreparable harm if their members lose access to public lands after the Sale.

### D.   Balance of Hardships and Public Interest[10]

Plaintiffs argue that the remaining two *Winter* factors favor a preliminary injunction because they will be irreparably harmed if the Sale occurs, whereas Defendants suffer no harm if the Sale is stayed pending a decision on the merits. (ECF No. 11 at 27-28.) Plaintiffs additionally argue that the public has a strong interest in ensuring that federal agencies comply with environmental laws. (*Id.* at 28.) Defendants counter, in gist, that Plaintiffs ignore competing environmental considerations, namely, that the Sale will facilitate remediation of the Site. (ECF Nos. 30 at 29; 31 at 30.) In reply, Plaintiffs counter that the Sale is not needed for remediation to continue. (ECF No. 33 at 28-29.) The Court again agrees with Plaintiffs.

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). The court must then weigh "the hardships of each party against one another." *Id*. As to public interest, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted).

Plaintiffs have demonstrated that the balance of hardships tips sharply in their favor. As discussed *supra*, Plaintiffs will suffer immediate and irreparable harm[11] if the

---

[10]The equities and the public interest merge when the government is a party. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

[11]At the Hearing, counsel for ARC argued that Plaintiffs fail to demonstrate hardship because they argue in their reply brief that the Court has the authority to "unwind" the Sale. But this mischaracterizes Plaintiffs' argument: Plaintiffs claim that the balance of hardships tips sharply in their favor in part because ARC could sell land or minerals immediately after the Sale. (ECF No. 33 at 28.)

Sale proceeds. As Plaintiffs point out, and the Court agrees, Defendants have failed to show any harm that would occur if the Court preliminarily enjoins the Sale. Defendants assert that the Sale would facilitate remediation, but as Plaintiffs responded in their reply brief, the remediation will proceed regardless of whether the Sale occurs. In other words, ongoing remediation is the status quo. To the extent that Federal Defendants assert the Sale will "accelerate the clean up process," the Court reiterates its analysis from the merits of Plaintiffs' FLPMA claim that these assertions appear unsupported by the administrative records. Moreover, even assuming the remediation process was measurably slower or involved more administrative burdens under public ownership than posed under private ownership, remediation under public ownership has been the status quo for decades, which cuts against any argument that it would now cause irreparable harm.

As to the final *Winter* factor, the Court agrees with Plaintiffs that it favors granting the Motion. Here, the public interest would be served given that "Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward." *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (assessing the *Winter* public interest factor and finding that suspension of the mining project comported with the public interest where the EIS was inadequate).

**IV.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Plaintiffs' motion for a preliminary injunction (ECF No. 11) is granted. Pending a final decision on the merits, Defendants are enjoined from commencing the Sale.

///

///

DATED THIS 16th Day of July 2026.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE